12601

### MASSACHUSETTS BONDING & INSURANCE COMPANY
v. LAW *ET AL.*

(147 S. E., 444)

*Messrs. Nelson & Mullins,* and *J. F. Flowers,* for petitioner,

*Messrs. Nicholls, Wyche & Byrnes,* for respondents, 

February 22, 1929.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The petitioner seeks, and the respondents resist, in the original jurisdiction of this Court, a writ of mandamus, to compel the respondents, constituting the board of commissioners of Spartanburg County, to require Paul M. Murph, county treasurer of that county, to execute a new bond, as required by the provisions of Section 747, Volume 3, Code of 1922, thereby relieving the petitioner from further liability as surety of the said county treasurer.

The admitted facts are as follows: Petitioner, a Massachusetts corporation, properly licensed to do business in this State, is engaged, amongst other things, in the business of suretyship for compensation. Mr. Murph was appointed by the Governor to the office of county treasurer of Spartanburg County on July 6, 1927, for the term of four years, commencing on July 1st of that year. In August thereafter, Mr. Murph, as principal, and the petitioner, as surety, executed and delivered proper official bond of Mr. Murph, in the form required by Section 736, Volume 3, Code of 1922, the condition whereof was that Mr. Murph should "well and truly perform the duties of said office, as now or hereafter required by law, during the whole period he may continue in said office." The premium on the said bond is $200

per annum, to be paid annually in advance; such premiums were to be paid by Spartanburg County, as provided by Section 749, Volume 3, Code of 1922. The petitioner filed proper claim against the county with the county board of commissioners for the first premium for the year ending June 30, 1928, and payment thereof was made. On January 14, 1928, petitioner wrote a letter to the county board of commissioners that it desired to be relieved from the bond of Mr. Murph as county treasurer, but the board refused to take the requested step. On July 1, 1928, petitioner received payment of its claim filed against the county for $200, as premium on the bond for the year ending June 30, 1929. On July 28, 1928, the petitioner caused to be served on the county board of commissioners a written notice to the effect that it desired to be relieved from further liability on Mr. Murph's bond, as provided by Section 747, Id., and demanded that the commissioners give proper notice, as required by that Section, to Mr. Murph to execute a new bond, in lieu of the former bond on which the petitioner was surety. The commissioner still declined to proceed, as required by the petitioner. On November 8, 1928, petitioner, through its local agent, Hon. Howard McCravy, wrote a letter to the county board of commissioners to the effect that the petitioner desired to be relieved as surety on Mr. Murph's bond, and inclosed therewith check for the sum of $129.22 to cover the *pro rata* return premium. On November 9th, Mr. McCravy, as agent, was advised by the county attorneys that the petitioner had no right to be relieved as surety, and the check sent by Mr. McCravy was returned to him. On December 6, 1928, the petitioner caused to be tendered, in a legal manner, the sum of $200 to the county board of commissioners for the premium on the bond for the year commencing July 1, 1928, and ending June 30, 1929, which tender was refused. The commissioners give assurance that they intend to continue to pay the agreed premiums on the bond as they shall become due and payable.

While the matter appears not to be involved in any way in the decision of the case at bar, it is due Mr. Murph, the county treasurer, that it be stated that no charge of any kind, reflecting in the slightest manner upon his conduct, either as a man or as an official, is shown in the record. The attorney for the respondents, in the hearing in this Court, made the positive statement that there was no such charge, and that statement was in no wise disputed by the attorney for the petitioner, who stated that he did not know the reason why his client sought release as surety.

The case turns very much upon the proper meaning and construction of Section 747, Volume 3, Code of 1922, which is as follows:

"When any of the sureties of any officer elected or appointed to any office shall, in writing, notify the proper officer, whose duty it is to approve the bond of such officer, that they desire to be relieved from their suretyship, it shall be the duty of the officer authorized by law to approve the same to require said officer to execute a new bond with surety, which, when approved, shall be as valid as the bond given on the original election or appointment of such officer; and the sureties upon the prior bond shall be released from responsibility for all acts or defaults of such officer which may be done or committed subsequent to the approval of such new bond."

That Section was first enacted in 1887, and the original title was, "An Act for the Relief of Surety upon Official Bonds of Certain Officers." At the time of the enactment of the law, the practice of having the modern surety companies as sureties on official bonds was not known in our State. In fact, it seems that under the law such companies could not become sureties on bonds of that class. The only sureties known to us were individuals. Prior to 1887, when an individual had become surety on the bond of a public official, there was no way in which he could become discharged therefrom, except by the consent of the official and

the approving authority. Even after an individual surety had died, his estate could not be relieved from the suretyship. The consequence was, in many instances, that the estate of an individual, who was surety on an official bond, could not be settled until after the full expiration of the time for which the bond continued in force, and until full settlement of the affiairs of the official had been made. These individual sureties, except in the rarest instances, received no compensation for the risks they assumed; the bonds being executed by them, generally, for the sole reason of their friendship to the principal. In order to allow an individual, and particularly his estate, to be relieved from suretyship on an official bond, and perhaps for other reasons not now occurring to us, the General Assembly enacted Section 747, *supra*.

Later, in 1892, the Legislature passed an Act entitled: "An Act to Permit County and State Officers to Give Bonds, and Procure Policies of Assurance, Insurance [in?], Guarantee or Trust Companies in Lieu of Official Bonds with Individual Sureties." That Act has been amended from time to time; the original Act and the amendatory enactments now appearing as Sections 749 and 750 of Volume 3, *supra*.

Under the provisions of Section 749, a county official, required by law to give bond, is also required to procure that bond, called in the statute "a bond of indemnity, or policy of assurance or insurance," in some reliable surety company, authorized to do business in this State, and the cost of the bond so procured is to be paid out of the ordinary county funds. By Section 750, "Any foreign company empowered by its home charter to issue bonds or policies or [of] suretyship may \* \* \* issue said bonds in this State: *Provided,* That they comply with the law now of force in this State regulating foreign insurance companies, *all of which law which is now of force is hereby made applicable to companies issuing bonds or policies of suretyship.* (Italics added.)

The identical language taken from Section 750, *supra,* is also set forth in the same volume of the Code as Section

4102, under the headnote, "Issuance of policies by Foreign Surety Companies," in Article 1 of Chapter 48, relating to "Insurance Department and Insurance Companies."

In the laws, to which attention has been directed, it is to be observed that the word "bond" is used synonymously with those other words, "bond of indemnity," "policy of assurance or insurance," "policy of suretyship."

Under the provisions of our laws, it seems clear that the "bonds" or contract entered into by foreign surety companies in this State, guaranteeing the fidelity of public officials, and the performance of contracts, are to be construed by the same rules as those which apply to the policies or contracts of insurance companies; and the law of principal and surety is not usually applicable. This appears to have been the view of our Court, as expressed by Mr. Justice Watts (now Chief Justice) in the case of *State Agricultural & Mechanical Society v. Taylor,* 104 S. C., 167, 88 S. E., 372, when this was said:

"The exceptions in a measure depend largely as to the law by which bonds of surety companies are to be construed. We are of opinion that they should not be given the strict construction that would be given one who was a surety as an individual, but the surety companies are in business for profit or hire. The individual accommodates the principal by giving his surety for friendship or kindness and without profit. The surety company is in business for gain, profit, and hire. They become sureties for the premiums paid it, and in constructing [construing?] their liability they occupy the same position as that of an insurance contract, which, as a fact and matter of law, it is."

To somewhat the same effect was the holding in *Walker v. Holtzclaw,* 57 S. C., 459, 35 S. E., 754:

"The doctrine that a surety is a favorite of the law, and that it [the contract] must be construed strictly as to him, does not apply to cases where the surety receives compensation, and the suretyship is in the line of his regular business." (Syllabus.)

The decisions of our Court are in harmony with those of many of our sister states and the rule laid down by recognized authorities, generallly, as the following citations will show:

" 'Fidelity insurance,' as the term is usually employed, is a contract whereby one, for a consideration, agrees to indemnify another against loss arising from the want of honesty, integrity, or fidelity of employees or others holding positions of trust; and while it [the agreement], may, in form, resemble a contract of suretyship, it is, in substance and effect, a contract of insurance, and the general principles governing the older forms of insurance, such as fire, life, and marine, are applicable to this more modern form of insurance" —citing cases. *John Church Co. v. Ætna Indemnity Co.*, 13 Ga. App., 826, 80 S. E., 1093.

"The general rule is that contracts of surety companies, which receive compensation for the risk assumed, are governed by the same principles as insurance contracts." *Syllabus, National Surety Co. v. Commonwealth*, 125 Va., 223, 99 S. E., 657.

"Although a voluntary surety is a favorite of the law, and entitled to stand on the strict letter of his contract, the rule of strictissimi juris does not apply to a corporation organized to enter into bonds and undertakings for a profit. Such companies are essentially insurers, and their contracts being usually expressed in terms prescribed by themselves should be construed most strongly in favor of the obligee therein." *Syllabus, Board of Commissioners v. Clemens*, 85 W. Va., 11, 100 S. E., 680, 7 A. L. R., 373.

"Defendant is authorized to do business in this state; this business consists in doing something more than collecting premiums in this state. It will be required to give value received for its premiums. * * *

" 'The law does not have the same solicitude for corporations engaged in giving indemnity bonds for profit as it does for the individual surety who voluntarily undertakes to answer for the obligations of another. Although calling

themselves sureties, such corporations are in fact insurers, and in determining their rights and liabilities, the rules peculiar to suretyship do not apply.' *Chicago Lumber Co. v. Douglass,* 89 Kan., 308, 131 P., 563, 44 L. R. A. (N. S.), 843, and cases cited." *Forest City, etc., v. Davis,* 192 N. C., 108, 133 S. E., 530.

"Generally speaking, a contract of suretyship by a surety company is governed by the same rules as the contracts of other sureties, but some distinctions are made by the Courts in construing such contracts. The doctrine that a surety is a favorite of the law, and that a claim against him is strictissimi juris, does not apply where the bond or undertaking is executed upon a consideration by a corporation organized to make such bonds or undertakings for profit. While such corporations may call themselves "surety companies," their business is in all essential particulars that of insurers. Their contracts are usually in the terms prescribed by themselves, and should be construed most strongly in favor of the obligee." 32 Cyc., 306.

A case of more than ordinary interest is that of *Hull v. Massachusetts Bonding & Insurance Co.,* 86 Kan., 342, 120 P., 544, because the petitioner here was a party; and there the Court declared: "The rule that sureties are favorites of the law does not apply to corporations engaged in the business of furnishing bonds for profit." (Syllabus.)

Following the trend of the cited authorities, it is evident that the petitioner herein is to be regarded more as an *insurer* that as a *surety,* and that the contract entered into by it with the respondents is to be construed under the laws relating to insurance rather than those pertaining to principal and surety. That being true, the inquiry turns to the consideration to be given to, and the effect of the provisions of Section 747, quoted in full earlier, as to the relief of sureties, as that Section relates to the laws of force as to insurance companies.

It must be conceded that Section 747, when originally enacted as a statute, had no reference, direct, or even remotely indirect, to either surety or insurance companies, or that it concerned, in any way, the laws as to insurance. So much is clear, for the sole reason, if no other, that, at the time of its adoption, surety and insurance companies could not be accepted as sureties on the bonds of public officials.

But now we must take into account two matters of considerable importance, occurring since the adoption of the original Act. The first is the later enactment, permitting corporations, engaged in the particular business, to become sureties on official bonds. The other is the adoption of the Code, whereby all the statutes under review were brought together in one body of laws.

Did the original enactment of the legislation now contained in Sections 749, 750, and 4102 of Volume 3 of the Code, and the adoption of the Code, have the effect of amending the law declared in Section 747, so as to include, in any way, surety companies therein? If the later Acts were amendatory of Section 747, then in what way?

As to the first question, we agree with the petitioner in the position that the effect of the after legislation was to so amend Section 747 as to include in its provisions corporations engaged in the surety business for compensation.

"A statute providing for relief of 'sureties' generally from further liability on a bond or for petition for such relief applies to surety companies which, by an amendment of the statute, have been authorized to become sureties on bonds or undertakings required by law, where there is nothing in the original statute or the amendment excepting them." 32 Cyc., 307.

But the affirmative answer to the first question does not of itself alone show the petitioner to be entitled to the relief it here seeks.

The subsequent legislative enactments, when they amended Section 747, by admitting surety companies into its provisions, also amended that Section in other and further ways. Those later enactments that inserted the words "surety companies" in the law providing for the relief of sureties on bonds of public officers carried with that amendment into that law the provision that, in seeking and obtaining the relief there allowed, a "surety company" must "comply with the law now of force in this State regulating foreign insurance companies." And, in so far as Section 747 was amended so as to include "surety companies," likewise it was amended to say that those companies, asking and obtaining relief thereunder, should be bound by the provision that all the law "regulating foreign insurance companies * * * now of force is hereby made applicable to companies issuing bonds or policies of suretyship." And this answers largely the second question, as to the extent of the amendments made to Section 747 by the later laws, all appearing now in the Code of 1922. In reaching this conclusion, we have taken into consideration certain rules as to the interpretation of laws, which are adverted to in the authorities cited, as follows:

(1) All rules for statutory construction are subservient to the one that the legislative intent must prevail, if it can reasonably be discovered in the language used. *Trammell v. Victor Mfg. Co.,* 102 S. C., 483, 86 S. E., 1057.

(2) "The legislative intention must be gathered from the language of the statute as a whole, not that found in any particular section or proviso." *State v. Columbia Ry. Gas & Electric Co.,* 112 S. C., 528, 100 S. E., 355.

(3) "Effect must be given, if possible, to every part of statute." *Crescent Mfg. Co. v. Tax Commission,* 129 S. C., 480, 124 S. E., 761.

(4) All sections of statute relating to same subject, re-enacted in Code, should be construed together to harmonize

them if possible. *Rookard v. A. & C. A. L. Ry.*, 89 S. C., 371, 71 S. E., 992.

It appears from the undisputed facts in this cause that the petitioner *contracted* with the respondents to become, and to remain, the surety on the bond of Mr. Murph, as county treasurer, for a period of four years, commencing July 1, 1927, for agreed compensation, to be paid annually in advance by the county commissioners of Spartanburg county; that two of the annual payments of premiums, all so far due, have been paid to, and accepted by, the petitioner. Those are the only agreements contained in the *contract* so far as the Court is advised. There is no charge by petitioner of any *breach of the contract* on the part of the respondents, either the county board or Mr. Murph.

Section 747, *supra, permits* an accommodation surety to be relieved from his suretyship by giving notice to the proper authority. But *accommodation surety* is not bound by the *laws of force as to foreign insurance companies*. The petitioner is on a different footing—it is bound by those laws. We know of no law that permits "foreign insurance companies," or other insurance companies for that matter, to be relieved from their contracts just because they desire not to carry them out. And the only reason given by the petitioner for seeking release from its contract with the respondents is its *desire* to be released.

It is said, however, that Section 747 is a part and parcel of petitioner's contract with respondents. So it is—just as all the laws of the State that may relate to the subject-matter of a contract are parts of that contract. And, too, the laws as to foreign insurance companies are embraced in the contract here involved.

Petitioner's counsel argue that the case of *Bolen v. National Surety Co.*, 108 S. C., 403, 94 S. E., 1049, while not decisive of the precise question here, is favorable to their cause, since there it was indicated that surety companies had been included in the provisions of Section 747 and that they

had the right thereunder to effect a cancellation of bonds executed by them. That case is in no manner inconsistent with our holding here. Even if we should concede it to have been there decided positively, which we do not, that a surety company may cancel, under Section 747, a bond executed by it, still it was not held that such cancellation could be made in the face of a contract to the contrary.

Mr. Justice Cothran, in setting forth his large number of regulations affecting foreign insurance companies and surety companies, has overlooked one not found, perhaps, in the statutory law, but constantly referred to in the decisions of this Court, which is just as binding on those companies as the things required of them by our statutes. In order to help complete the list made by him, we add:

(17) To observe contracts made.

A county official *is required* by Section 749 of Volume 3 of the Code, to "secure bond in some reliable surety company authorized to do business in the State of South Carolina." If he is refused bond by the surety companies, after proper application, the law provides that a personal bond shall be accepted.

The question in this case does not concern surety companies incorporated under the laws of this State. It only touches a "foreign surety company." What is here said is, therefore, merely obiter. The personal opinion of the writer is, that a domestic surety company for hire likewise would be bound to carry out its contract to become and remain surety on an officer's bond in the face of the provisions of the law allowing relief under certain conditions to sureties, as set forth in Section 747 of Volume 3 of the Code.

Since the dissenting opinion calls to its aid in defense of the petitioner's right to break its contract, the beautiful words of a beloved poet, we are minded to reply from the poetical fount of an "anonymous" poet, so minor as not to be known, in the following rhyme to the petitioner:

You shall not "palter with us in a double sense,"
 Agree to bond for full four years an officer, under the law,
Then, when the contract's terms make you to wince,
 Without a reason save your fears,
Hand back a jot of thousands made at our expense,
 And from your bond, at will, withdraw.
The premiums' paid, and for them you did cope,
 Your burden, then, with cheerful content bear;
The knot you tied with your own furnished rope;
 So "keep the word of promise to our ear,"
 Nor "break it to our hope."

The petitioner has not shown itself entitled to the writ of mandamus prayed for, and the judgment of this Court is that the said petition be, and the same is hereby, refused.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES STABLER and CARTER concur.

MR. JUSTICE COTHRAN ˙(dissenting) : I agree with the declaration in the proposed opinion of Mr. Justice Blease:

"Did the original enactment of the legislation now contained in Sections 749, 750, and 4102 of Volume 3 of the Code, and the adoption of the Code, have the effect of amend-ing the law declared in Section 747, so as to include, in any way, surety companies therein? * * * As to the first question (the one just stated), we agree with the petitioner in the position that the effect of the after legislation was to so amend Section 747 as to include in its provisions corporations engaged in the surety business for compensation."

(See, also, Section 4103, providing that, where one surety or two or more sureties are required, the execution of a bond by a surety company shall be sufficient.)

I think that that conclusion is decisive of the right of the petitioner to the mandamus, unless there appear something in the legislation intended to qualify the grant. Surely without some very positive indication to this effect, the Act will not be construed as conferring a right with one hand and withdrawing it with the other; as those

"That palter with us in a double sense,
That keep the word of promise to our ear,
And break it to our hope."

This qualification affecting foreign companies only amounting to an absolute annihilation of the privilege conceded to have been conferred upon *all* surety companies is sought to be found in the proviso of the amending statute, Section 750, which in its entirety reads as follows:

"Any foreign company empowered by its home charter to issue bonds or policies or [of] suretyship, may, by the consent and approval of the Governor, Comptroller General and Secretary of State, issue said bonds, in this State: *Provided, That they comply with the law now of force in this State regulating foreign insurance companies, all of which law which is now of force is hereby made applicable to companies issuing bonds or policies of suretyship."*

The same proviso is contained in Section 749: "Provided, further, That said company, unless it be incorporated under the laws of this State, comply with *the law regulating Foreign Insurance Companies."*

Section 750, in this respect, is reproduced with a negligible difference, as Section 4102, and in 4103.

The general subjection of foreign corporations to the laws of South Carolina, while doing business in this State, was not intended to be created by the proviso in Section 750. That already existed under Section 4039:

"All and every such foreign corporation carrying on business or owning property in this State shall be subject to the laws of the same in like manner as corporations chartered under the laws of this State," etc.

What was intended by the proviso was, as it expresses, that foreign surety companies should with "the law now of force in this State, *regulating* foreign insurance companies"; that is, that, having qualified to do business in the State and to conduct it according to the regulations referred to, it enters with all the rights of a domestic corporation, in-

cluding that conferred by Section 747. It is so declared in Section 4028, as I shall show.

Turning then to the Code, beginning with Section 4063, for the laws of this State *"regulating foreign insurance companies,"* we find the following: (1) The visitation and examination by the Insurance Commissioner of the Company and its affairs; (2) the issuing of licenses and the collection of license fees; (3) the revocation of licenses for cause; (4) the requirement of bonds; (5) the payment of an additional license fee, graduated; (6) the execution of an affidavit that the company has not violated any of the laws of this State and that it accepts the terms and obligations imposed by law; (7) agents' licenses; (8) the conduct of its business only through authorized agents; (9) fixing the amount of surplus or capital requisite to do business; (10) penalty for violations of law; (11) persons deemed agents; (12) estoppel to deny corporate powers; (13) payment of taxes; (14) no discrimination; (15) certain inducements prohibited; (16) venue of actions.

I may have omitted some of the *regulations* affecting these companies, but those mentioned are sufficiently multitudinous to evidence the purpose of the Legislature that *regulations* of this character were what was intended by the proviso in question.

I find in none of them the slightest indication of a purpose to deny to these surety companies the privilege concededly granted to them by Section 747.

It seems clear from the opinion of Mr. Justice Blease that the denial of the privilege conceded to have been granted to foreign surety companies is based solely upon the proviso in the Section referring to those companies. As to domestic surety companies, no such denial can be asserted; consequently domestic companies have the untrammeled privilege accorded by Section 747. To allow that privilege to domestic companies, and to deny it to foreign companies, is directly in the teeth of Section 4028:

"Foreign corporations duly incorporated under the laws of any State of the United States * * * are hereby permitted to locate and carry on business within the State of South Carolina *in like manner and with like powers as corporations of like kind and class created under the laws of this State.* * * * "

It has been suggested that the engagement of the surety company constitutes a *contract,* and is not subject to cancellation. The engagement of a domestic company is likewise a contract, the consideration being, as in the case of a foreign company, the premium collected; the engagement of a personal surety is likewise a contract, the consideration being the risk of loss to the obligee. If this be the criterion, neither a domestic company nor a personal surety could take advantage of the privilege offered by Section 747.

In view of Section 4028, which guarantees to foreign corporations the same rights as are enjoyed by domestic corporations, I cannot see how there can justly be a discrimination in favor of personal sureties, and domestic surety companies against foreign companies engaged in the same business.

I do not understand, as possibly might be inferred from the opinion, that under Section 749 a county official is *required* to give a bond signed by a corporate surety.

For these reasons I think that the petitioner is entitled to the mandamus asked for.